UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN JAY KOPINETZ, | : | |
| | : | |
| Plaintiff, | : | Civil No. 3:16-CV-01074 |
| | : | |
| v. | : | |
| | : | (Judge Brann) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security | : : : | |
| | : | |
| Defendant. | : : | |

**MEMORANDUM**

February 23, 2017

The above-captioned action is one seeking review of a decision of the Acting Commissioner of Social Security ("Commissioner")[1], denying Plaintiff John Jay Kopinetz's ("Kopinetz") application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI, respectively.  For the reasons set forth below, the Court will affirm the Commissioner's denial of DIB, but vacate and remand the Commissioner's denial of SSI.

**I.  BACKGROUND**

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin, Acting Commissioner of Social Security as the defendant in this suit.

last insured." It is undisputed that Kopinetz met the insured status requirements of the Social Security Act through March 31, 2010. (Tr. 17).[2] In order to establish entitlement to disability insurance benefits, Kopinetz was required to establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131(a); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

SSI is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Kopinetz applied protectively for DIB on May 24, 2013 and SSI on June 30, 2013, alleging disability beginning May 12, 2009. (Tr. 14, 124-134). His claims were initially denied on August 27, 2013 (Tr. 98, 99). Kopinetz requested a hearing before the Administrative Law Judge ("ALJ") Office of Disability and Adjudication and Review of the Social Security Administration, and one was held on August 6, 2014. (Tr. 33, 109-111). At the hearing, Kopinetz was represented by counsel, and a vocational expert testified. (Tr. 33-67). On September 22, 2014, the ALJ issued a decision denying Kopinetz's application. (Tr. 11-32). Kopinetz filed a request for review with the Appeals Council, which was denied. (Tr. 1-10). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Kopinetz filed a complaint in this Court on June 6, 2016. (Doc. 1). The Commissioner filed an answer on August 8, 2016. (Doc. 8). After supporting and opposing briefs were

---

[2] References to "Tr. __" are to pages of the administrative record filed by the Defendant as part of the Answer (Docs. 8 and 9) on August 8, 2016.

submitted (Docs. 10 and 11), the appeal[3] became ripe for disposition.

Kopinetz was born on November 26, 1965, has at least a high school education, and is able to communicate in English. (Tr. 27). In the past, Kopinetz worked as a pastry chef and bakery manager. (Tr. 26). Kopinetz has not engaged in substantial gainful activity since the alleged onset date of disability, May 12, 2009. (Tr. 17).

Kopinetz has the following severe impairments: osteoarthritis, degenerative disc disease, obesity, narcotic addiction/abuse and, as of June 2014, anxiety and major depressive disorder. (Tr. 17).

## II. STANDARD OF REVIEW

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id. The factual findings of the Commissioner, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson, 529 F.3d at 200 (3d Cir. 2008) (quoting Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)) (internal quotations and citations omitted). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v.

---

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (citing Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The United States Court of Appeals for the Third Circuit has stated,

> [O]ur decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986)). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Id. (citing Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)).

### III. SEQUENTIAL EVALUATION PROCESS

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting Plummer, 186 F.3d at 427) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42

U.S.C. § 423(d)(2)(A)).  The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. § 404.1520 to determine whether the claimant is disabled.  In Plummer, the Third Circuit set out the five-steps:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.]1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987) . . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.

**IV. DISCUSSION**

The administrative record in this case is 444 pages in length and I have thoroughly reviewed the record.  The relevant periods of time under review are from the alleged onset date of May 12, 2009, through March 31, 2010, the date last insured, and from June 30, 2013, the

5

application date through September 22, 2014, which is the date of the ALJ's decision.

Kopinetz appeals the ALJ's determination on two grounds: (1) substantial evidence does not support the ALJ's evaluation of the medical opinion evidence; and (2) the ALJ denied Kopinetz's right to due process by improperly curtailing cross-examination of the vocational expert.

The ALJ went through each step of the sequential evaluation process and (1) found that Kopinetz had not engaged in substantial gainful activity since May 12, 2009, the alleged onset date; (2) found that Kopinetz had the severe impairments of osteoarthritis, degenerative disc disease, obesity, narcotic addiction/abuse and, as of June 2014, anxiety and major depressive disorder; (3) found that Kopinetz's impairments did not meet or equal a listed impairment; and (4) concluded that Kopinetz could not perform his past relevant work, but that he could perform light work with several limitations. (Tr. 14-28). Specifically, in addressing Kopinetz's residual functional capacity ("RFC"), the ALJ provided the following limitations:

> [Kopinetz] could only occasionally balance, stoop, crouch, kneel and climb but never on ladders, ropes or scaffolds or crawl. [Kopinetz] could only occasionally push/pull with the lower extremities. He must avoid concentrated exposure to temperature extremes of cold, vibrations and hazards including moving machinery and unprotected heights. [Kopinetz] should be afforded an option to transfer positions from standing to sitting, but would not be off task when transferring, with a maximum of up to 1-hour intervals before transferring. As of June 2014[,] [Kopinetz] was further limited to no complex tasks, but can do simple routine tasks, in low stress work environment defined as occasional decision making and occasional changes in work setting, and occasional interaction with public.

(Tr. 20).

The medical history as it relates to Kopinetz's DIB claim is first provided. Kopinetz's primary care physician is Frank M. Moro, M.D., who has been treating Kopinetz since July 14,

2008. (Tr. 380). From the date last insured, May 12, 2009, Kopinetz has complained of knee pain, increased left hip and occasional low back pain. (Tr. 355, 340, 343, 349, 352). He reported some relief with Celebrex and has received injections to relieve his pain. (Tr. 346-47, 352-53). On June 4, 2009, Dr. Moro limited Kopinetz to lifting no more than 20 pounds. (Tr. 353).

A MRI of Kopinetz's lumbar spine on October 9, 2009, revealed a central disc herniation at L5-S1, a disc bulge at L3-L4 with mild-to-moderate left neural foraminal narrowing, and a congenitally narrowed AP canal diameter. (Tr. 431). Kopinetz also had a MRI on his left hip, showing bone marrow edema, cartilaginous labral tear, joint effusion, fluid in the greater trochanteric bursa, and increased signal in the distal gluteus medius tendon, consistent with tendinopathy. (Tr. 433).

On November 12, 2009, Kopinetz was seen by Elizabeth Karazim-Horchos, D.O., for an initial physiatric evaluation. (Tr. 204). Kopinetz complained of extreme left hip pain that was worse at night, but that sitting could relieve his symptoms. (Tr. 2014). Dr. Karazim-Horchos noted that Kopinetz had functional motor strength in his bilateral lower extremities, symmetric and brisk deep tendon reflexes, intact sensation, but somewhat antalgic gait and painful and limited range of motion in his hip. (Tr. 205). Kopinetz was prescribed pain medication and referred for a hip injection that was administered a week later. (Tr. 205, 213).

Kopinetz next saw Charles Hubbard, M.D., on November 17, 2009, for a consultative examination as referred from Dr. Moro. (Tr. 190). Dr. Hubbard diagnosed Kopinetz with left hip strain with degenerative joint disease, low back pain and degenerative disc disease. (Tr. 190). Dr. Hubbard informed Kopinetz that an injection for his hip may give him some temporary

relief, but that only surgery, in the form of a hip replacement, would give him significant relief. (Tr. 190).

On November 19, 2009, Kopinetz was seen by Thomas DiBenedetto, M.D., for an independent medical examination, requested by his attorney. (Tr. 194-99). Based upon Dr. DiBenedetto's examination, he believes that Kopinetz is not totally disabled based on his orthopedic complaints, but rather, that Kopinetz has some hip arthritis, a possible labral tear, and some signs of sciatic nerve irritation most likely from congenital spinal stenosis. (Tr. 198). Dr. DiBenedetto further stated that he would not place any restrictions on Plaintiff regarding any work injury, because he did not believe that Kopinetz sustained a work injury. (Tr. 198). Finally, Dr. DiBenedetto provided that Kopinetz's degenerative change in his left hip and back would not prevent him from performing his job as a baker. (Tr. 199).

On February 8, 2010, Kopinetz saw Alan Gillick, M.D., an orthopedic specialist, complaining of low back and left hip pain. (Tr. 201). Dr. Gillick noted that Kopinetz had some low midline tenderness in his low back, but no pain along the paraspinal musculature, no pain with flexion extension or extension rotation maneuvers, and no pain with straight leg raising bilaterally. (Tr. 201). Dr. Gillick did note that Kopinetz had pain with internal rotation of his left hip and decreased sensation of the left lateral thigh. (Tr. 201). Dr. Gillick did not believe that Kopinetz's symptoms were the result of any injury to his low back, and based on the relief of symptoms with the injection to his hip, the left hip pain would not be caused by the L5-S1 distribution. (Tr. 202). Accordingly, Dr. Gillick concluded that no surgery would be necessary regarding Kopinetz's low back. (Tr. 202).

Kopinetz had a checkup with Dr. Moro on February 11, 2010. At that time, Kopinetz

reported that the two left hip injections helped relieve his pain, but that he still had pain in his left hip. (Tr. 337). Kopinetz further stated that his back pain improved since he saw the orthopedic surgeon and pain specialist. (Tr. 337). On April 1, 2010, Kopinetz underwent a left total hip arthroplasty, performed by Dr. Gregory Raab at the Milton S. Hershey Medical Center. (Tr. 276, 279). Upon discharge, Kopinetz was reported to have progressed well through physical therapy and was independent in ambulation, transfers, and activities of daily living. (Tr. 280).

With regard to Kopinetz's SSI claim, the medical records relevant to this period show that on September 4, 2013 during a visit with his primary care physician, Dr. Moro, Kopinetz was complaining of difficulty sleeping and right hip pain. (Tr. 404). Dr. Moro noted that Kopinetz had a normal back, extremities, musculoskeletal, and neurological examination. (Tr. 405). Dr. Moro further noted that Kopinetz had 2+ dorsalis pedis and posterior tibialis pulses; he was alert, oriented to person, place, and time; had full motor strength, 2+ deep tendon reflexes, normal Babinski sign, intact sensory examination, normal gait, and intact cranial nerves. (Tr. 405).

Included in the record is a letter from Lynda Graves, M.D., dated December 9, 2013. (Tr. 399). Dr. Graves indicates that Kopinetz is a former patient of hers but is no longer seen by her because he moved out of the area. (Id.). Dr. Graves' letter states that Kopinetz had high blood pressure, hyperlipidemia, as well as serious orthopedic issues which caused ongoing pain despite hip replacement. (Id.). She further provides that Kopinetz cannot stand for more than ten minutes or sit for more than thirty minutes. (Id.). Dr. Graves also states that she would not expect him to be able to function in a competitive work environment due to his longstanding bipolar affective disorder which causes unpredictable changes in mood and energy levels, as well

as progressive loss of executive function. (Id.).

Kopinetz again had a follow-up appointment with Dr. Moro on May 21, 2014. (Tr. 400). Dr. Moro noted that Kopinetz's hypertension had improved, and his osteoarthritis, degenerative disc disease, vitamin D deficiency, and narcotic addiction remained unchanged. (Tr. 402). Dr. Moro's notes also provide that he prescribed Zoloft (sertraline) to Kopinetz which improved Kopinetz's depression. (Id.).

Kopinetz's first visit to Matthew Berger, M.D., a psychiatrist, was on June 17, 2014. (Tr. 419-22). Kopinetz was complaining of a history of social anxiety and depression. (Id.). Kopinetz stated that he was currently taking sertraline, provided by Dr. Moro for his depression and anxiety. (Tr. 419). Dr. Berger diagnosed Kopinetz with an anxiety state, unspecified, and assessed a Global Assessment of Functioning (GAF) score of 50. (Tr. 422). Dr. Berger increased Kopinetz's dosage of sertraline and started him on clonazepam (benzodiazepine) and referred him for individual cognitive behavioral therapy and relaxation training. (Id.).

Dr. Moro provided a partially filled out physical RFC on June 29, 2014, wherein he checked a box that Kopinetz had a marked limitation in his ability to deal with work stress. (Tr. 413). The remainder of the partially filled out RFC is mostly illegible. (Tr. 412-416).

Dr. Berger saw Kopinetz again on July 1, 2014, with Kopinetz's chief complaints of being anxious about his upcoming disability hearing and that he continued to have frequent anxiety. (Tr. 423). Dr. Berger assessed Kopinetz with a GAF score of 53 and continued him on his current medications. (Tr. 426). Dr. Berger saw Kopinetz again on July 28, 2014. (Tr. 427). Kopinetz continued to report anxiety and depression. (Id.). His mental status examination showed periodic irritability during the examination. (Tr. 429). Kopinetz was again assessed

with a GAF score of 53 and his medications stayed the same.  (Id.).

      Finally, the record shows two state agency physician assessments.  These record review assessments were performed upon Kopinetz's initial filing of his claims.  Specifically, on August 22, 2013, Kurt Maas, M.D., a state agency, non-examining physician, reviewed Kopinetz's medical records and opined that he could perform a range of light work.  (Tr. 85-87, 94-95).  Similarly, on August 1, 2013, James Vizza, Ph.D., also performed a review of Kopinetz's medical files and concluded that there was no evidence of a medically determinable mental impairment.  (Tr. 84, 93).

      The burden is on an applicant for DIB to establish that he suffered from a severe medically determinable impairment which has lasted for a continuous 12-month period and that the impairment existed on or prior to the date last insured.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. § 1520(a)(4)(ii); Matullo, 926 F.2d at 244.  The worsening of a condition after the expiration of a claimant's disability insured status cannot be the basis for an award of social security benefits.  Id.  Further, an applicant for DIB must come forward with medical evidence showing that he has an impairment, its severity during the time the disability is alleged, and show how the impairment affects his functioning during the time he alleges he is disabled.  20 C.F.R. § 404.1512(c).

      With regard to Kopinetz's DIB claim, I find that the record reveals that the decision of the Commissioner is supported by substantial evidence.  The medical notes of Dr. Moro, Kopinetz's primary care physician, indicate that with the hip injections, hip replacement, and medications, Kopinetz reported that he was walking better and his back pain was controlled.  Dr. Moro's notes further indicate that he restricted Kopinetz from lifting no more than 20 pounds.

(Tr. 353). This limitation is consistent with Dr. Kurt Maas's RFC, the non-examining state agency physician, limiting Kopinetz to lifting no more than 20 pounds. (Tr. 85). Additionally, the medical records show that after Kopinetz underwent a left hip replacement, he was able to ambulate with only a slight limp and use of single point cane. He continued to improve and Dr. Raab, who performed the hip replacement, noted that he could return to work without restriction.

Additionally, as the ALJ notes, the medical evidence does not support any alleged mental impairments prior to June 2014. The record does not contain any evidence from any mental health professional, and no treating or examining physician provided a statement, until June 2014, roughly four years after Kopinetz's date last insured, March 31, 2010, that Kopinetz suffered from a mental impairment.

The only medical evidence indicating a mental impairment is the incomplete physical RFC provided by Kopinetz's primary care physician on June 29, 2014, wherein Dr. Moro noted that Kopinetz's ability to deal with work stress is marked. (Tr. 413). Further, Kopinetz was only first prescribed Zoloft around May 21, 2014 by Dr. Moro to treat for depression. (Tr. 402). Thus, as stated above, there is no medical evidence in the record relating to the relevant time period at issue in Kopinetz's DIB claim, i.e., May 12, 2009 through March 31, 2010. Accordingly, we will affirm the decision of the Commissioner as it relates the Kopinetz's DIB claim.

However, with regard to Kopinetz's SSI claim, we find that the substantial evidence does not support the decision of the Commissioner. The Court notes that there are at least four precedential Third Circuit opinions codifying the treating source rule that addresses the standard

for an ALJ to reject a treating source medical opinion in favor of a non-treating source medical opinion.  See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011); Diaz v. Comm'r of Soc. Sec., 577 F.3d 500 (3d Cir. 2009); Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352 (3d Cir. 2008); Morales, 225 F.3d at 317.  Additionally, SSR 96-6p provides that a non-treating, non-examining medical opinion may be assigned greater weight than a treating medical opinion in "appropriate circumstances."  SSR 96-6p does not define "appropriate circumstances," but provides an example: when the non-treating, non-examining source was able to review a "complete case record ... which provides more detailed and comprehensive information than what was available to the individual's treating source."  SSR 96-6p, 1996 WL 374180 at *3 (July 2, 1996).  This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the phrase "appropriate circumstance" should be construed as a similarly compelling reason.  See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 223 (2008).

      Defendant asserts that the holding from the Third Circuit in Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), prevents Kopinetz from prevailing on the argument that the ALJ in this case erred in relying on the state agency physicians' opinions, because they rendered the opinions in the absence of a complete medical record. (Doc. 11, p. 22).  In Chandler, the Third Circuit held that a time lapse from the date a non-treating, non-examining physician rendered an opinion to the date the administrative law judge issued an opinion, in the absence of an opinion from a treating physician, was not a basis for remand.  Id.  The remainder of the opinion rendered in Chandler, is dicta, and will be treated as such by this Court.  See Compton v. Colvin, Civ. No. 15-CV-1248, 2016 WL 6471037, at *12 (M.D. Pa. Oct. 31, 2016).

The Third Circuit has not upheld any instance, in any precedential opinion, in which an ALJ has assigned less than controlling weight to an opinion rendered by a treating physician based solely on one opinion from a non-treating, non-examining examiner who did not review *a complete case record*. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011); Brownawell, 554 F.3d 352 (holding that three non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory" and omitted significant objective findings promulgated after the non-treating opinions were issued).

In the instant case, regarding the medical opinion evidence involving Kopinetz's mental health impairments, the ALJ gave great weight to the opinion of James Vizza, Psy.D., the non-examining psychological consultant, that Kopinetz did not have a medically determinable mental impairment at that time. Specifically, Dr. Vizza explained that the medical record contains no evidence of a diagnoses of depression. (Tr. 93). This determination was made in August 2013. (Tr. 93). However, Dr. Vizza did not have the benefit of reviewing Kopinetz's full medical record at that point in time.

The ALJ accorded partial weight to the opinion of Kopinetz's primary care physician, Dr. Moro, providing that Kopinetz had marked limitations on work stress. The ALJ reasoned that Dr. Moro is not a psychiatrist. Additionally, the ALJ gave some weight to Dr. Berger's statements regarding Kopinetz's mental impairments. Dr. Berger has been treating Kopinetz since June 17, 2014. Dr. Berger notes that Kopinetz suffers from depression, social anxiety, and a subdued mood. The ALJ gave greater weight to Dr. Berger's GAF score of 53 rather than the initial score of 50 when Kopinetz first saw him, rationalizing that the GAF score improved after treatment with Dr. Berger began.

Regarding the ALJ's reliance on the GAF score, the law provides that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." Pounds v. Astrue, 772 F. Supp. 2d 713, 723 (W.D. Pa. 2011). Moreover, the latest edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), recommends that the GAF scoring scale be discontinued because it has a conceptual lack of clarity and "questionable psychometrics in routine practice." DSM (Fifth) at 16; see Gorby v. Colvin, Civ. No. 14-CV-2195, 2017 WL 105977, at *7 (M.D. Pa. Jan. 11, 2017) (finding that the GAF score does not provide substantial evidence for the ALJ to discredit plaintiff's treating physician).

Moreover, this Court takes issue with the ALJ's reliance on Dr. Vizza's opinion rendered in August of 2013, before Kopinetz's primary care physician's RFC occurred, and before a number of psychiatric appointments occurred with treating psychiatrist Dr. Berger. The Third Circuit and subsequent cases from this District have held that, especially in an instance in which a condition worsens, "an administrative law judge errs in relying solely on an opinion issued by a non-treating, non-examining physician who has not reviewed a complete case record." Compton, 2016 WL 6471037, at *13.

Accordingly, I have determined that the ALJ improperly afforded great weight to the opinion of the non-treating, non-examining physician, Dr. Vizza, in determining Kopinetz's mental health RFC, because Dr. Vizza issued his opinion before substantial evidence of the record occurred that showed a worsening of Kopinetz's mental health impairment. Therefore, remand on this basis is necessary. I decline to address Kopinetz's other allegation of error, as remand may produce a different result on this claim, making discussion of it moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec.,

Civ. No. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## V. CONCLUSION

Based upon a review of the record, it is determined that the Commissioner's decision to deny Kopinetz's DIB claim under Title II was supported by substantial evidence and will be affirmed.  However, we find that the Commissioner's decision as to Kopinetz's SSI claim under Title XVI is not supported by substantial evidence and therefore, pursuant to 42 U.S.C. § 405(g), this Court will vacate that portion of the Commissioner of Social Security's decision and remand this case for further proceedings.  An appropriate Order follows.

BY THE COURT:

s/ *Matthew W. Brann*

Matthew W. Brann
United States District Judge